UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

Thomas Brennan,                            Case No. 3:20-cv-1965

        Plaintiff,

        v.                                       MEMORANDUM OPINION
                                            AND ORDER

IES Energy Solutions, LLC,

        Defendant.

## I. INTRODUCTION

Before me is the motion of Plaintiff Thomas Brennan for a default judgment. (Doc. No. 7). Brennan moved for a default judgment after the Clerk of Court entered a default on November 18, 2020. (Doc. No. 5). Brennan seeks $165,330.40 in damages, $77,454.90 in attorney's fees, $541.67 in costs, and post judgment interest under 28 U.S.C. § 1961. (*Id.*). For the reasons that follow, Brennan's motion for default judgment is granted in part and denied in part.

## II. BACKGROUND

Brennan alleges he worked for Defendant IES Energy Solutions, LLC, from around June 2018 to July 22, 2020. (*See* Doc. No. 1). Defendant is headquartered in Toledo, Ohio, but provides various insulation services to individual homeowners, commercial building owners, engineers, architects and consultants, builders, general contractors, and Heating Ventilation and Air Conditioning ("HVAC") companies located in Michigan and Ohio. Around June of 2018, Defendant employed Brennan to market Defendant's services to potential customers – or "leads" –

which Defendant would generate. Brennan would also distribute Defendant's marketing materials in certain neighborhoods. The work Brennan performed was the primary way in which Defendant secured customers to apply for its services. Defendant required Brennan to work from 9:00 a.m. to 9:00 p.m., Monday through Saturday. Brennan worked exclusively for Defendant during this time. Brennan was not permitted to take any time off from work without Defendant's permission.

Around the time he was hired, Brennan was required to undergo two and a half weeks of training, which took place Monday through Friday, for between four to five hours a day. This training covered information about Defendant and the industry's background, procedures to follow when presenting Defendant's services to potential customers, and other various sales techniques. Defendant also provided Brennan with a "pitch book" as part of this training, which was a set of detailed scripts that Brennan was required to follow when making pitches to potential customers. These scripts differed depending on the particular service being marketed. Brennan was instructed to memorize the words in these scripts and to employ certain body language when giving them. Defendant held mandatory weekly meetings where Brennan and others like him discussed and analyzed new sales techniques, participated in sales role-play, and provided reports about potential customers that did not ultimately sign up for Defendant's services. Brennan was never paid for his participation in the mandatory weekly meetings.

Brennan alleges that a typical day for him consisted of meeting with four different leads, with each meeting occupying a three-hour window in Brennan's day. The leads were always generated and assigned to Brennan by Defendant, who would provide specific instructions regarding the services to market to each lead. Brennan drove between 300 to 400 miles a day and was responsible for all job-related expenses, including automobile costs, maintenance, depreciation, gasoline expenses, insurance, cell phone charges, and other equipment.

When Brennan met with these leads, those interested in purchasing services from Defendant would be required to submit an application. Defendant had sole discretion over whether to accept the application and provide services, and on several occasions a potential customer that Brennan convinced to apply was rejected by Defendant for reasons outside Brennan's control. Brennan was paid on a sliding-scale commission basis, which paid Brennan a percentage of profits that ranged from 5% to 9% for each job. The commission amount was non-negotiable and would not be paid until after the installation or service it was based on had been completed. This meant that even though paychecks were supposed to be distributed every Friday, there were weeks where Brennan received no pay at all. As a result, there were many times where Brennan was not paid the minimum wage for all hours worked in a given workweek, as well as times where Brennan was not paid overtime pay for all hours that Brennan worked over 40 in a given workweek.

On July 22, 2020, Brennan complained to Defendant that he wanted to be "a W-2 employee instead of a 1099 independent contractor" and notified Defendant he wanted to receive the benefits afforded to IES employees, including "health insurance, workers' compensation, unemployment aid, COVID-19 aid, and reimbursement of certain expenses. (Doc. No. 1 at 7). Later that day, Defendant effectively terminated Brennan, telling him: "'Your[sic] an independent Salesperson 1099. . . You don't[sic] get benefits . . . Your # is being blocked only contact is calling office . . . you are no longer allowed on our property at all.'" (*Id.*).

### III.   STANDARD

"Once a default is entered against a defendant, that party is deemed to have admitted all of the well pleaded allegations in the Complaint." *Poskovic v. D2 Mgmt., LLC*, No. 5:19-cv-1222, 2019 WL 6727098 at *1 (N.D. Ohio Dec. 11, 2019) (quoting *Ford Motor Co. v. Cross*, 441 F. Supp. 2d 837, 846 (E.D. Mich. 2006)). While the factual allegations relating to liability are taken as true, the court must still determine whether those facts are sufficient to state a claim for relief. *Zinganything, LLC v.*

3

*Imp. Store*, 158 F. Supp. 3d 668, 672 (N.D. Ohio 2016). And if the plaintiff has successfully stated one or more claims for relief, the court must conduct an inquiry to ascertain the amount of damages with reasonable certainty. *See Vesligaj v. Peterson*, 331 F. App'x 351, 355 (6th Cir. 2009) (explaining that because the allegations in the complaint with respect to damages are not deemed true, "[t]he district court must [] conduct an inquiry in order to ascertain the amount of damages with reasonable certainty.") (quoting *Credit Lyonnais Sec. (USA), Inc. v. Alcantara*, 183 F.3d 151, 155 (2d Cir. 1999)) (further citation omitted).

### IV. DISCUSSION

Brennan brings a total of seven different wage and hour claims. Six of these are minimum wage and overtime pay claims brought under the Fair Labor Standards Act (FLSA) (counts I and II), Ohio Minimum Wage Fair Standards Act (OMWFSA) (counts III and IV), and Michigan Workforce Opportunity Wage Act (WOWA) (count VI and VII). The remaining claim is for untimely payment of wages in violation of the Ohio Prompt Pay Act (OPPA) (count V). Brennan also brings retaliation claims under the FLSA (count VIII) and the Ohio Constitution (count IX), as well as a claim for unjust enrichment, (count X).

**A.  WAGE AND HOUR CLAIMS**

**1.  Employer Status**

As a threshold issue, for Brennan to succeed on any of his wage and hour claims, Brennan must show that Defendant was his employer. The same analysis will apply to whether Brennan is an employee for all of his wage and hour claims.[1]

---

[1] *See Thomas v. Speedway SuperAmerica, LLC*, 506 F.3d 496, 501 (6th Cir. 2007) (explaining that Ohio's minimum wage and hour statute "expressly incorporates the standards and principles found in the FLSA."); *see also Dikker v. 5-Star Team Leasing, LLC*, 243 F. Supp. 3d 844, 854 n.3 (W.D. Mich. 2017) (explaining the FLSA and Michigan Workforce Opportunity and Wage Act minimum wage and overtime provisions largely parallel each other) (further citation omitted).

"While the [FLSA] does define the terms 'employee,' 'employer,' and 'employ,' the definitions are exceedingly broad and generally unhelpful."[2] *Solis v. Laurelbrook Sanitarium & Sch., Inc.*, 642 F.3d 518, 522 (6th Cir. 2011) (further citation omitted). "Whether an employment relationship exists under a given set of circumstances 'is not fixed by labels that parties may attach to their relationship nor by common law categories nor by classifications under other statutes.'" *Id.* (quoting *Powell v. U.S. Cartridge Co.*, 339 U.S. 497, 528 (1950)). Instead, "it is the 'economic reality' of the relationship between parties that determines whether their relationship is one of employment or something else." *Id.* The Sixth Circuit has explained that this "economic reality" test considers the following six factors:

> 1) the permanency of the relationship between the parties; 2) the degree of skill required for the rendering of the services; 3) the worker's investment in equipment or materials for the task; 4) the worker's opportunity for profit or loss, depending upon his skill; ... 5) the degree of the alleged employer's right to control the manner in which the work is performed ...; and 6) whether the service rendered is an integral part of the alleged employer's business.

*Acosta v. Off Duty Police Servs., Inc.*, 915 F.3d 1050, 1055 (6th Cir. 2019) (internal quotation marks omitted) (quoting *Keller v. Miri Microsys. LLC*, 781 F.3d 799, 807 (6th Cir. 2015)) (further citation omitted). "None of these factors is determinative on its own, and each must be considered 'with an eye toward the ultimate question – [the worker's] economic dependence on or independence from' the alleged employer." *Id.*

Here, many of the above factors support finding that Brennan was an employee of Defendant. The permanency of the relationship between the parties was based on an understanding that Brennan would work for Defendant indefinitely, which, along with the fact that Brennan was working exclusively for Defendant, suggests the parties contemplated

---

[2] "'[E]mployee' means any individual employed by an employer." 29 U.S.C. § 203(e)(1). "'Employer' includes any person acting directly or indirectly in the interest of an employer in relation to an employee." 29 U.S.C. § 203(d). "'Employ' includes to suffer or permit to work." 29 U.S.C. § 203(g).

5

Brennan being economically dependent on Defendant during his employment. *See Acosta*, 915 F.3d at 1057-58. Brennan was hired without any prior experience in sales, which suggests there was not a high degree of skill required to render the services he performed. *See id.* at 1055-56. Defendant exercised a high degree of control over the manner in which the work was performed, providing Brennan with a pitch book that specified the procedures Brennan was supposed to follow when making sales.

Finally, although Brennan was paid on a commission basis and thus had some potential for increased earnings if he made additional sales, he was not permitted to independently generate his own leads, rendering him dependent on Defendant's skill in generating and providing leads for Brennan to pursue. Further, even if Brennan was able to convince a lead to submit a customer application, Defendant had complete discretion when it came to whether to accept or reject the application.

Based on all of the above, I conclude Defendant was Brennan's employer for the purposes of his FLSA claims as well as his claims under Ohio and Michigan law.

   2. **FLSA Claims**

An employee seeking unpaid overtime or unpaid minimum wage under the FLSA bears "the burden of proving that he performed work for which he was not properly compensated." *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 686-87 (1964), *superseded by statute on other grounds as stated in Integrity Staffing Solutions, Inc. v. Busk*, 574 U.S. 27, 32 (2014).

Here, Brennan has satisfied his burden through an affidavit accompanied by his own records of his pay for 16 workweeks. (Doc. Nos. 7 & 7-1). Brennan alleged he worked at least from 9:00 a.m. to 9:00 p.m. on Monday through Friday, and from 9:00 a.m. to 4:00 p.m. on Saturdays, averaging a total of 72 hours per week. (Doc. No. 7-1 at 2, 6). His allegations provide the kind of detailed information about specific hours that is needed in this context. *See Viet v. Le*, 951 F.3d 818,

823-24 (6th Cir. 2020) (discussing cases and explaining that testimony about specific hours that employee worked can be sufficient while conclusory allegations about employee's work schedule are not sufficient). And the records he provided are sufficient evidence to support his claim that he was not properly compensated for at least some workweeks while he was employed by Defendant.

For example, for the pay period beginning on December 30, 2019, and ending on January 4, 2020, Brennan performed 72 hours of work but received only $300 from Defendant, which amounted to only $76.21 after accounting for expenses Brennan was required to pay. Because the applicable minimum wage for this work under the FLSA is $7.25 per hour, *see* 29 U.S.C. § 206(a)(1)(C), and $10.875 per hour of overtime pay, 29 U.S.C. § 207(a)(1), Brennan's evidence demonstrated that he performed work for which he was not properly compensated under the FLSA.

I conclude Brennan is entitled to judgment in his favor on his counts one and two of his complaint: his claims for minimum wage and overtime pay violations under the FLSA.

### 3. Ohio Law Claims

Brennan's claims for minimum wage and overtime pay violations under Ohio law are subject to the same standards for determining liability as his FLSA claims. *Barnes*, 2017 WL 5714091 at *4. Thus, for the same reasons detailed immediately above, Brennan is entitled to judgment in his favor on counts three and four of his complaint: his claims for minimum wage and overtime pay violations of Ohio law.

Brennan also brings a claim under the Ohio Prompt Pay Act ("OPPA"), which requires any entity doing business in Ohio to, "on or before the first day of each month, pay all its employees the wages earned by them during the first half of the preceding month." Ohio Rev. Code § 4113.15(A). If wages remain unpaid for thirty days beyond the regularly scheduled payday, the employer is liable to the employee for six percent of the amount of unpaid wages, or $200, whichever is greater. Ohio Rev. Code § 4113.15(B). Because Brennan has sufficiently alleged that Defendant owes him wages

for minimum wage and overtime violations under the FLSA and Ohio law, and these wages have remained unpaid for more than thirty days beyond Brennan's regularly scheduled payday, Brennan has shown he is entitled to judgment in his favor on count five of his complaint.

### 4. Michigan Law Claims

Counts six and seven of Brennan's complaint are for minimum wage and overtime pay violations of Michigan's Workforce Opportunity Wage Act ("WOWA").

The WOWA provides for a minimum wage of $9.25 in 2018, $9.45 in 2019, and $9.65 in 2020. Mich. Comp. Laws §§ 408.934(1)(e)-(g). It also states that it does not apply to an employer that is subject to the minimum wage provisions of the FLSA, "unless those federal minimum wage provisions would result in a lower minimum hourly wage than provided in this act." Mich. Comp. Laws § 408.940(1).

Here, because the FLSA would result in a lower minimum hourly wage than the WOWA, Brennan can advance a minimum wage claim under Michigan law. And because the two acts largely parallel each other, Brennan is entitled to judgment in his favor on his minimum wage claim under Michigan law for the same reasons he was entitled to judgment in his favor on his minimum wage claim under the FLSA. *See Vernon v. Go Ventures, LLC*, No. 16-cv-13818, 2017 WL 2002011, at *5 (E.D. Mich. May 12, 2017) (denying motion to dismiss minimum wage claims under WOWA).

Brennan's claim for overtime pay under the WOWA faces a different obstacle. This is because the overtime pay provisions of the WOWA are found in § 408.934a, but § 408.940(a) of the act provides that when an employer is only subject to both the WOWA and the FLSA because the state minimum wage exceeds the federal minimum wage, § 408.934a does not apply. *See Vernon*, 2017 WL 2002011, at *5 (discussing the interaction of these two provisions in a previous version of the statute). Here, Defendant is only subject to the WOWA because the Michigan minimum wage is

higher than the federal minimum wage. Thus, the overtime pay provisions of the WOWA do not apply and Brennan cannot advance the claim he brings in count seven of his complaint.

### 5. Damages

Because I have found Brennan is entitled to default judgment in his favor on six of his seven wage and hour claims, the issue becomes determining the appropriate measure of damages for those claims.

"To effectuate a default judgment, the Court must determine the appropriate level of relief." *W. Digital Tech., Inc. v. XYZ Corp.*, No. 17-cv-2653, 2019 WL 2026532, at *4 (N.D. Ohio 2019) (citing Fed. R. Civ. Pro. 55(b)(2)). Although liability may be shown by the well-pleaded allegations, the Court must conduct an inquiry to ascertain the amount of damages with reasonable certainty. *See Vesligaj*, 331 F. App'x at 355. In doing so, the Court may conduct hearings or otherwise investigate to determine the appropriate amount of damages. Fed. R. Civ. Pro. 55(b)(2).

Brennan seeks $22,699.39 in minimum wage damages, $45,398.79 in minimum wage liquidated damages, $27,982.32 in overtime pay damages, $27,982.32 in overtime pay liquidated damages, and $3,040.90 in damages on his OPPA claim. Although I have found Brennan has provided evidence sufficient for me to conclude that in at least some workweeks, he performed work for which he was not properly compensated, I am unable to grant Brennan's request for these damages at this time.

Brennan correctly points out that, if an employer fails to keep contemporaneous pay records for all hours worked, an employee bringing a suit under the FLSA can establish by inference the total amount of damages. (Doc. No. 7 at 20). *See also Monroe v. FTC USA, LLC*, 860 F.3d 389, 399 (6th Cir. 2017) (explaining that where the employer's records are inaccurate or inadequate, an employee's burden of proof on damages can be relaxed because it is the employer's duty to keep records under the FLSA) (citing *Mt. Clemens*, 328 U.S. at 687). But even with the relaxed burden that

9

exists for proving damages in this context, the affidavit and accompanying records in the present case are not enough for me to determine even an approximate amount of damages with reasonable certainty. I note some of the problems with Brennan's request for damages below.

Brennan uses a method to calculate damages that is different from the one used in the cases Brennan cites throughout his motion. For example, to determine how much he would need to be paid every week to comply with minimum wage laws, Brennan multiplied the minimum wage by the number of hours he worked. But in *Barnes v. Abraham*, the court rejected such an approach and chose instead to multiply the minimum wage rate by 40 to calculate what the employee would have to make each week to comply with minimum wage requirements. *Barnes*, 2017 WL 5714091 at *4 (collecting cases). The court then handled the overtime pay claims before it by multiplying the applicable minimum wage by 1.5 and multiplying the product by the number of overtime hours an employee worked.

While these two methods may yield the same total result for any given workweek, using one rather than the other has implications for the rest of Brennan's calculations. This is because Brennan determined his total unpaid minimum wage damages by finding the sum of all the workweeks in which he was paid less than the actual minimum wage and then extrapolating that out to cover the entire time he was employed with Defendant. But in some of the workweeks he listed, whether he was paid less than minimum wage depends on whether the minimum wage is calculated by: multiplying the rate by 40, as the court in *Barnes* did; or, multiplying the rate by 40 plus the number of overtime hours worked, as Brennan did. This is seen in the workweek labeled "1/5-1/11" in his compilation of pay records. Brennan states he was paid $356.21 for this week. If that number is divided by 72, Brennan was paid approximately $4.95 per hour, well below any of the minimum wage rates that would apply here. But if that number is divided by 40, Brennan received

10

approximately $8.91 per hour, which would violate Michigan's minimum wage requirements but comply with the federal and Ohio requirements.

This uncertainty has implications for the damages owed Brennan on his overtime claims as well as his claim under the OPPA. In the context of his overtime claims, the damages he is owed depends on a calculation that involves multiplying one-half of his regular rate of pay by the number of overtime hours he worked in a given workweek. *See Monroe*, 860 F.3d at 415. But the "regular rate of pay" portion of this equation is represented by the average rate of pay he received for a given workweek, or the minimum wage rate, whichever is higher. Going back to the workweek entitled "1/5-1/11" in Brennan's records as just one example, the regular rate of pay would be different depending on the method used. And for Brennan's claim under the OPPA, which entitles him to damages equal to 6% of the amount he is owed in unpaid wages that remain unpaid for 30 days beyond the regularly scheduled payday, I cannot calculate what damages he is entitled to without first determining how much he was owed in unpaid wages.

Given the uncertainties remaining after review of Brennan's evidence and argument in support of his damages claim, I am unable to determine with reasonable certainty the appropriate measure of damages for Brennan's wage and hour claims. Brennan shall submit supplemental filings documenting his damages requests within 30 days of the date of this Memorandum Opinion and Order.

**B.      RETALIATION CLAIMS**

In counts eight and nine of his complaint, Brennan brings claims for unlawful retaliation in violation of the Fair Labor Standards Act and Ohio law.

**1.    FLSA**

The FLSA's retaliation provision states it is unlawful for any employer:

> to discharge or in any other manner discriminate against any employee because such employee has filed any complaint or instituted or caused to be instituted any

11

>proceeding under or related to this chapter, or has testified or is about to testify in any such proceeding, or has served or is about to serve on an industry committee.

29 U.S.C. § 215(a)(3).

To establish a prima facie case of retaliation, an employee must prove, among other things, that they have engaged in a protected activity under the FLSA. *Adair v. Charter County of Wayne*, 452 F.3d 482, 489 (6th Cir. 2006). One such protected activity is filing a complaint, which the Supreme Court has held includes making an oral complaint. *See Kasten v. Saint-Gobain Performance Plastics Corp.*, 563 U.S. 1, 4 (2011). But for the communication to qualify as filing a complaint for the purposes of the FLSA's antiretaliation provision, there must be "'some degree of formality,' such that a reasonable employer would understand it 'as an assertion of rights protected by the statute and a call for their protection.'" *Rogers v. Webstaurant Store, Inc.*, 774 F. App'x 278, 280 (6th Cir. 2019) (quoting *Kasten*, 563 U.S. at 14).

Brennan argues that Defendant illegally retaliated when it terminated him after he "complained to Defendant that he should be a W-2 employee instead of a 1099 independent contractor, and that Defendant should provide him with certain benefits afforded to IES employees, including, for example, health insurance, worker's compensation, unemployment benefits, COVID-19 aid, and reimbursement of certain expenses." But making this statement does not constitute engaging in a protected activity because a reasonable employer would not interpret his complaint as an assertion of his rights under the FLSA.[3]

Although the FLSA provides certain rights to employees, it does not provide individuals the right to be hired as an employee in the first place. Thus, Brennan's stating that he "should be a W-2 employee instead of an independent contractor" does not qualify as an assertion of his statutory

---

[3] As discussed earlier, as a matter of economic reality, Brennan was an employee, and as such was entitled to all the protections afforded by the FLSA. But that is separate from the question of whether he was asserting those rights when he made the statement that he claims led to his termination.

12

rights. *See Landaeta v. New York and Presbyterian Hosp., Inc.*, No. 12 Civ. 4462, 2014 WL 836991, at *8-9 (S.D.N.Y. Mar. 4, 2014) (holding that conversation where plaintiff complained to employer about being misclassified as an independent contractor rather than an employee does not constitute protected activity for purposes of FLSA retaliation claim).

The remainder of Brennan's statement to Defendant does not change things. The FLSA does not provide for health insurance, worker's compensation, unemployment benefits, or COVID-19 aid, so there is no reason for Defendant to perceive his request for those benefits as an assertion of rights under the FLSA. *See Rogers*, 774 F. App'x at 281 ("Not every grumble or 'expression[ ] of concern or discomfort or frustration' by an employee constitutes an FLSA complaint.") (quoting *Robinson v. Wal-Mart Stores, Inc.*, 341 F. Supp. 2d 759, 763 (W.D. Mich. 2004)). And while the lack of reimbursement for certain expenses might implicate the FLSA when an employee is complaining that the lack of reimbursement has caused them to receive less than minimum wage, *see* 29 C.F.R. § 531.35, Brennan does not allege he made any statements concerning minimum wage immediately prior to his termination.

Because Brennan's statement to Defendant was not an assertion of statutory rights under the FLSA, he has not alleged he engaged in protected activity and thus he is not entitled to judgment in his favor on his retaliation claim under the FLSA.

2. **Ohio law**

Article II, Section 34(a) of the Ohio Constitution states, in relevant part, "[n]o employer shall discharge or in any other manner discriminate or retaliate against an employee for exercising any right under this section or any law or regulation implementing its provisions."

Brennan claims Defendant violated this provision by discharging Brennan when Brennan sought to enforce his right to minimum wage and overtime pay. But Brennan's claim here fails for a similar reason his FLSA retaliation claim failed: Brennan does not allege he told Defendant he was

trying to exercise any rights implicated by § 34(a). Brennan's complaint that he should be an employee rather than an independent contractor is not the same as a complaint that he should be paid the minimum wage. And Brennan's statement that Defendant should provide him with certain benefits afforded to IES employees does not implicate § 34(a) because none of the benefits Brennan referred to are guaranteed by § 34(a). *See Pandey v. Rascal Unit, Ltd.*, No. 2:09-cv-550, 2010 WL 1817284, at *2 (S.D. Ohio Apr. 30, 2010) ("[T]he only conduct which § 34(a) protects is employees exercising their rights under it.").

C. **UNJUST ENRICHMENT**

"[T]o state a claim for unjust enrichment, a plaintiff must allege '(1) a benefit conferred by a plaintiff upon a defendant; (2) knowledge by the defendant of the benefit; and (3) retention of the benefit by the defendant under circumstances where it would be unjust to do so without payment ('unjust enrichment').'" *Carter v. PJS of Parma, Inc.*, No. 1:15-cv-1545, 2016 WL 1316354, at*5 (N.D. Ohio Apr. 4, 2016) (quoting *Filo v. Liberato*, 987 N.E.2d 707 (Ohio Ct. App. 2013)).

Here, many of Brennan's allegations concerning his unjust enrichment claim overlap with his allegations supporting his wage and hour claims. To avoid the risk of awarding duplicative damages, I will hold his motion for default judgment in abeyance as to his unjust enrichment claim and make a final determination after resolution of his wage and hour claims. In his supplemental filings on the issue of damages, Brennan will have the opportunity to identify how the $2,750 in unpaid commissions he seeks is not already accounted for by any damages award he would receive on his wage and hour claims.

D. **ATTORNEY'S FEES**

"The FLSA provides that '[t]he court in such action shall, in addition to any judgment awarded to the plaintiff or plaintiffs, allow a reasonable attorney's fee to be paid by the defendant, and costs of the action.'" *Smith v. Service Master Corp.*, 529 F. App'x 363, 367 (6th Cir. 2014) (quoting

29 U.S.C. § 216(b)). An award of attorney's fees under § 216(b) is mandatory. *Id.* (citing *United Slate, Tile & Composition Roofers, Damp & Waterproof Workers Ass'n, Local 307 v. G & M Roofing & Sheet Metal Co.*, 732 F.2d 495, 501 (6th Cir. 1984)) (further citation omitted). "[T]he most critical factor governing the reasonableness of a fee award 'is the degree of success obtained.'" *Id.* (quoting *Waldo v. Consumers Energy Co.*, 726 F.3d 802, 822 (6th Cir. 2013)); *Hensley v. Eckerhart*, 461 U.S. 424, 436 (1983).

Although Brennan has succeeded to a degree because his motion for default judgment is being granted as to the issue of liability for six of his seven wage and hour claims, the ultimate measure of his success is better determined after resolution of the damages issues that remain. For that reason, I hold in abeyance his motion for default judgment to the extent he seeks an award of attorney's fees.

Further, Plaintiff's counsel seeks a fee award in the amount of $77,454.90 for a claimed total of 214.90 hours worked on a case in which the Defendant never filed an answer or other responsive pleading and in which no discovery has been exchanged. Plaintiff's counsel shall submit detailed records, including the specifics of the time claimed, to substantiate their fee request within 30 days of the date of this Memorandum Opinion and Order. Plaintiff is granted leave to file these records under seal.

## V. CONCLUSION

Brennan's motion for default judgment is granted in part and denied in part. Specifically, Brennan's motion is granted as to the issue of liability for counts one through six of his complaint. Brennan shall submit his supplemental filings as described above within 30 days of the date of this Memorandum Opinion and Order.

I deny Brennan's motion as to counts seven through nine of his complaint.  Count ten and his request for attorney's fees will be held in abeyance pending the submission of his supplemental filings.

So Ordered.

s/ Jeffrey J. Helmick  
United States District Judge